UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
STATE FARM FIRE & CASUALTY COMPANY
a/s/o KEVIN CURRAN AND ELIZABETH
CURRAN,

                Plaintiff,              **MEMORANDUM AND ORDER**
                                                      CV 05-4817 (WDW)

       -against-

NUTONE, INC.,

                Defendant.
------------------------------------------------------------X
**APPEARANCES:**

**STUART D. MARKOWITZ, ESQ.**
**LAW OFFICES OF STUART D. MARKOWITZ, P.C.**
Attorneys for Plaintiff
575 Jericho Turnpike, Suite 210
Jericho, New York 11753

**THOMAS P. LYNCH, ESQ.**
**LYNCH ROWIN LLP**
Attorneys for Defendant
630 Third Avenue
New York, New York, 10017

**WALL, Magistrate Judge:**

      Plaintiff State Farm Fire & Casualty Co. ("State Farm") commenced this diversity, products liability action against Broan Nutone, Inc. ("Nutone") to recover monies paid out to its insureds, Kevin and Elizabeth Currran, as a result of fire damage at the Currans' home. Plaintiff alleges that the fire was caused by a faulty bathroom ceiling fan in the home that was manufactured by defendant Nutone. Nutone disputes that the fire originated in the bathroom fan, and argues that even if the fire had started in the fan, the unit was modified subsequent to its manufacture to remove a safety feature. State Farm claims that if the fan was modified, Nutone

failed to warn users regarding the consequences of that modification.

A "Notice, Consent, and Order of Reference for the Exercise of Jurisdiction by a United States Magistrate Judge" was signed by both parties and approved by District Judge Spatt on November 28, 2006. Docket Entry ("DE") [17]. By Memorandum and Order dated September 30, 2008, the undersigned denied defendant's motion for summary judgment, finding that issues of fact existed. *See* DE [55]. Accordingly, a nonjury trial was held before the undersigned on May 12, 13, and 14, 2009. After completion of the trial, defendant Nutone declared bankruptcy, resulting in a stay of this case. The bankruptcy proceeding has been completed and thus the stay of this case has lifted.

At trial, plaintiff presented testimony of Michael Mirrer, Elizabeth Curran, Kevin Curran, Peter Pruyn, Thomas Karn, Joseph Cristino, and Oscar Berendsohn, as well as deposition testimony of Robert Mahoney; Michael Lane, and Eliot Duncan testified for the defense, and Nutone submitted deposition testimony from John Allison. Based on the evidence presented, as well as the post trial materials submitted by the parties, the court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure. To the extent that any of the findings of fact may be deemed a legal conclusion, it shall be deemed a conclusion of law, and vice versa.

**I. FINDINGS OF FACT**

A. Stipulated Facts

According to the joint pretrial order submitted by the parties, ("PTO") DE [61], the parties have stipulated to the following facts. On September 18, 2004, a fire took place at a residence located at 171 Country Village Lane, East Islip, New York (hereinafter "the

residence"). The residence was owned by Kevin and Elizabeth Curran and insured by plaintiff State Farm. State Farm made payments totaling $227,064.56 for damages sustained as a result of the fire. State Farm was subrogated to the Currans' rights under the insurance policy, and the parties have stipulated to damages in the amount of $227,065.00.

The residence is a one family, split level home built in 1959. The Currans purchased the residence on July 9, 1999. At that time, the upstairs bathroom was equipped with a Nutone Model Number 668N Bath Fan/Light combination ceiling unit (the "Nutone bathroom fan" or the "bathroom fan"). The Nutone bathroom fan was installed prior to the purchase of the residence by the Currans. From October 28, 1994 to July 9, 1999, the residence was owned by Michael Mirrer. From August 1985 to October 1994, the residence was owned by Cathy and Robert Mahoney.

The Nutone bathroom fan was manufactured by Nutone between 1985 and 1988. The fan contained three sub-assemblies consisting of a lamp, box, and a motor sub-assembly. The motor sub-assembly was not manufactured by Nutone, but rather by non-party Jakel Company, Inc. ("Jakel Co.").

B. Installation of the Bathroom Fan

The parties stipulated to the fact that the bathroom fan was already installed in the second floor bathroom when the Currans purchased the house. Kevin Curran testified that he did not change any of the fixtures in the bathroom, nor did he hire anyone to repair or modify the bathroom fan. Trial Transcript ("Tr.") at 52. Elizabeth Curran also testified that they never hired an electrician to repair or modify the bathroom fan. Tr. at 36. Some electrical work was done at the back of the house incident to extending the den. Tr. at 59. The Currans also had central air

conditioning installed, which involved the performance of some electrical work in the attic above the bathroom. Tr. at 59. Kevin Curran testified that about a month before the fire, the bathroom fan periodically made a humming noise. Tr. at 54. He did not attempt to fix the unit, nor did he observe any sparks coming from it. Tr. at 54.

The previous owner, Michael Mirrer, lived in the residence from October 1994 to July 1999, at which time he sold the property to the Currans. Tr. at 27, 28. He testified that during the time he lived in the residence, there was a fan in the ceiling of the bathroom. He did not install the bathroom fan, he did not modify it himself, and he did not pay anyone to repair or modify it. Tr. at 29. He does not recall any electrical problems with the fan, and he did not have any electrical work done in the house during his ownership of it. Tr. at 29. He reported that he had no problem with the light going on and off intermittently. Tr. at 30.

The owner previous to Mr. Mirrer was Robert Mahoney. PTO at 3. Mahoney and his family lived there from August 1985 until October 1994. Pl's Ex, 12, Mahoney Dep. at 7. He had no specific recollection as to whether the bathroom fan was already in the house when he moved in or whether they had it installed. *Id.* at 9-10. The Mahoneys renovated the bathroom in the early 1990s, and Mr. Mahoney stated that it was possible that they had the bathroom fan installed at that time. *Id.* at 15, 18. Mahoney did not experience any problems with the bathroom fan during the time he owned the home. *Id.* at 11.

Both cloth clad and plastic clad wiring existed in the bathroom. Tr. at 249. An electrician would use one type or the other, not both, thus indicating that work was done in the area on two different occasions. Tr. at 249.

C. Point of Origin of the Fire

On the night of the fire, Mr. Curran was at work and Mrs. Curran was home with their children. Tr. at 37. Mrs. Curran testified that when she put her son to bed for the night, she put the light on in the bathroom across from his room, but cannot remember whether it was the vanity light or the light that is part of the fan/light fixture. Tr. at 38, 45. At some point later, Mrs. Curran was lying on the couch when the light on the porch, which is located on the floor below the bathroom, went out. Tr. at 46-47. About two minutes later, she was downstairs watching television with her daughter when she heard a "big bang." Tr. at 39. When Mrs. Curran was halfway upstairs, the smoke detector went off, and when she reached the top of the stairs, she observed sparks coming from the bathroom and smoke. Tr. at 39. She left the house with the children, and called 911 and her husband from outside. Tr. at 39-40.

There was some contradictory testimony regarding Mrs. Curran's observation of sparks in the bathroom. The fire investigator's Supplementary Report states that Mrs. Curran "entered the 2nd floor bathroom and turned on the exhaust fan and light. Immediately thereafter she saw sparks coming out of the fan grating and she began to smell smoke." Pl's Ex. 1. Mrs. Curran disputes this account, Tr. at 44, 45, and testified she never went into the bathroom after she was aware there was a fire. Tr. at 49-50. The fire investigator's Fire Scene Worksheet also does not mention her going into the bathroom, stating only that "[h]omeowner states fan was on in 2nd fl bathroom, sparks started to come out of it, smelled smoke." Pl's Ex. 1. His

Regarding the point of origin of the fire, plaintiff provided testimony from Suffolk County Detective Peter Pruyn, the lead investigator for this fire, and Thomas Karn, a fire marshal for the Town of Babylon and private consultant regarding origin and cause investigations of fires.

5

Defendant provided testimony from Michael Lane, a certified fire investigator and private consultant.

This fire only involved a portion of the hallway, the second floor bathroom, and the area above the bathroom, into the roof rafters and through the roof. Tr. at 77. After the fire, the bathroom fan was hanging from a ceiling rather by an electrical wire. Tr. at 78. The rafter was burned through, and above was a large hole in the roof. Tr. at 79. Photograph #21 illustrated the level of damage to one particular rafter. Pl's Ex. 2. Based on the amount of damage done in this area, both Pruyn and Karn determined that the point of origin was below this rafter. Tr. at 79, 138.

As to other possible sources of ignition, Pruyn testified that the bathroom fan was the only ignition source in this location, that all natural causes of the fire were eliminated, and that there was no sign of an accelerant. Tr. at 80. Karn also found no other potential sources of ignition. Tr. at 125. He found no evidence that the branch wiring to the fan caused the fire, Tr. at 128, and the air conditioning unit showed external heat damage, but no evidence of having caused the fire. Tr. at 126. Joseph Cristino, an electrical engineer and consultant, testified there was no sign of fault activity that could have ignited the fire along the wiring going to the attic fan. Tr. at 206. He also ruled out the attic fan as an ignition source, Tr. at 207, and concluded that the fire started within the bathroom fan. Tr. at 226-27. Defense witness Lane agreed that the air conditioning unit was not the cause of the fire. Tr. at 419. He further testified that he believed the fire started in the attic, but did not have a specific cause of the fire or a specific location where it started. Tr. at 422.

D. Design of the Bathroom Fan

The Nutone bathroom fan is a combination fan and light fixture that contained three sub-assemblies consisting of a lamp, box, and a motor sub-assembly. Stip. Fact 12, PTO at p.11. The fan motor was not manufactured by Nutone, but rather was manufactured by Jakel Co. and purchased by Nutone as a component part. Stip. Fact 13, PTO at p.11; Def. Ex. I; Tr. at 455. The fan motor was subjected to destructive testing in the presence of Joseph Cristino, Oscar Berendsohn, Thomas Karn, Jerry Bakula from Nutone, and counsel for both parties. Tr. at 192. The fan was not energized during testing. Tr. 245. Eliot Duncan from Nutone was not present, but inspected the fan on a different occasion. Tr. at 452.

During testing, the fan motor was removed and separated into three basic parts, the rotor or impeller, the magnetic assembly, and the coil or windings wrapped around a plastic bobbin and attached to the magnetic assembly. Tr. at 196-97. Examination of the windings showed breaks and balls of copper that had melted and re-solidified. Tr. at 198; Ex. 3 photo 14, 15. Cristino testified that the melted and re-solidified copper closest to the magnetic assembly indicated that the motor was energized at the time of the fire. Tr. at 203. The plastic bobbin was gone or vaporized, and the outer wrap of the winding had discoloration on the inside, indicating high heat on that side. Tr. at 216. Cristino concluded that the fire started within the fan and found no evidence to support a theory that the fire started outside the fan. Tr. at 226-27.

Oscar Berendsohn, a metallurgist, testified that the die casting, which is the frame that holds the motor, contained zinc, aluminum, and a small amount of copper. Tr. at 290, 294. High humidity affected the die casting and caused it to crack. Tr. at 290. The motor wobbled as evidenced by scrapings of laminations on the motor's rotor. The rotor locked up, the motor

7

heated up, and a short circuit in the winding occurred. Tr. at 291. The melting copper had a high enough temperature to ignite organic material such as dust, which is composed largely of textile fibers, or insulation. Tr. at 301-02. Copper melts at 1,910° Fahrenheit, while the textile fibers will ignite at 1,000° Fahrenheit. Tr. at 291. Berendsohn concluded that this series of events led to the fire. Tr. at 290-92. He did not attempt to test his theory since it would be impossible to duplicate the corrosion of the die casting that led to the chain of events. Tr. at 298. Duncan did not dispute the use of zinc in the die casting, but testified that the bearing for the rotor is made of bronze. Tr. at 494.

E.  Thermal Cut-off Device

A thermal cut-off or "TCO" device is designed to sense high temperature and fail, thus de-energizing the motor. Tr. at 230. Sometimes called a one-shot or single-shot fuse, the entire motor must be replaced after the TCO has been activated. Tr. at 227, 231. The cost to replace the motor in this fan would be about $10 to $12. Tr. at 530. Cristino testified that a TCO in this fan motor probably would have prevented the fire. Tr. at 255-56.

Cristino testified that there was no TCO in the fan motor at the Curran residence, Tr. at 228, and Berendsohn's report also stated that he found no evidence that a TCO had been installed in this fan. Pl's Ex. 9, at ¶5.4. Cristino based his findings on several points. The specification for the Nutone Model 668N fan indicates that it is "Type IC inherently protected." Ex. 4. Cristino testified that "Type IC inherently protected" identifies an impedance protected motor, not one with a TCO. Tr. at 267. Duncan testified that the "IC" reference is to UL507 and concerns the fan light, not the fan motor. Tr. at 487-88.

Cristino also relied on the fact that there was no separate listing for a "thermal protection

8

device" on the bill of materials for the Nutone model 668N fan. Tr. at 268. Duncan testified that the bill of materials did list Nutone part number C53709, which was the fan motor. Tr. 454-55; Ex. B. Nutone part number C53709 corresponds with Jakel Co. part number J2380626146. Tr. 455. The Jakel Co. design specifications for the fan motor include a one-shot thermal protector. Tr. 464; Ex. 1, B, H, I. X-rays of an exemplar fan manufactured in September 1986 and having the same Jakel Co. part number J2380626146 showed the presence of a TCO. Ex. 11; Tr. at 466-68.

Cristino further testified that the Jakel Co. specifications for the motor indicate that no TCO was added to it until 1995. Tr. at 257-58. Duncan testified that the Jakel Co. drawings indicate that its motor was thermally-protected in 1982, Tr. at 456, and noted that although the Uchihasi Elcut thermal protector was added in 1995 as per Revision K, Tr. at 457, this TCO replaced the 139° X Microtherm protector that was added to the Jakel Co. drawing as Revision E in June of 1983. Tr. at 456.

The motor used in the bathroom fan in the Curran home bore an imprint indicating that it was manufactured by Jakel Co. Tr. at 469. There was testimony regarding whether the TCO in the Jakel Co. motor was removed from the fan at sometime subsequent to its manufacture. Examination of the fan motor from the fire at the Curran residence revealed a loose piece of motor coil connected by crimping to a wire that connected the fan to an outside power source. Tr. at 469; Ex. N15. A crimp connection is employed to join two wires. Tr. at 262-63. A post that protrudes from the end of a TCO remained in the fan motor and had a wire wrapped around it. Tr. at 473. Duncan identified the remains of the lead of the TCO in the bathroom fan, and testified that this crimped connection was how the TCO had been defeated. Tr. at 469. Duncan

9

testified that the wires were connected manually, Tr. at 539, and that this wiring would bypass the TCO and allow the motor to run. Tr. at 473. Both Cristino and Duncan testified that a motor would not be manufactured with a piece of loose wire, Tr. at 265, 471, and Cristino opined that to do so would be dangerous. Tr. at 265. Cristino did not offer an alternative explanation for the loose wiring.

Duncan demonstrated how the TCO would be removed by reference to the exemplar. Tr. at 473. It could be done using a small knife and scissors or cutters to cut the lead to the thermal unit. Tr. at 537. He testified that the removal of the TCO in the bathroom fan could not have occurred on the production floors of either Jakel Co. or Nutone since a line worker would not have the correct equipment, there would be no time, and production would back up. Tr. at 550-51. There would be no reason to modify the motor to remove a TCO since a worker would simply go get another motor. Tr. at 551.

Cristino did not, however, believe a TCO could have been removed in this case because the outer wrap of the coil appeared to be the original wrap and did not appear to be cut. Tr. at 237, 239. The wrap was also brittle and would be almost impossible to put back on if it had been removed. Tr. at 238. Cristino acknowledged that he did not have experience with this particular material. Tr. at 237. Duncan testified that the entire cover is not visible in the photograph, and that it was either cut or slit, and that there was a gap in the cover where the TCO would have been located. Tr. at 526. Cristino further testified that he didn't think a bypass of the TCO could be successfully performed "within the field." Tr. at 240.

Duncan testified that the TCO could have been triggered by a tool blocking the rotor during installation. Tr. at 530-31, 534. He also agreed that an electrician should know that

defeating a safety device would be dangerous but "electricians don't always know that. I have seen electricians do all kinds of things." Tr. at 530. He suggested that someone would bypass the TCO "[i]f they didn't have a motor available, or they didn't know how to get it, or didn't try to get it." Tr. at 552.

Duncan testified at his deposition that the product did not come with any warnings that specifically mentioned the TCO. Duncan Dep. at 136-37; Tr. at 528. He further stated that a fan could operate if the TCO was defeated or bypassed, Tr. at 528, and that he had seen TCO devices removed from fan motors about twice through the years. Tr. at 527-28.

## III. CONCLUSIONS OF LAW

New York law applies in this diversity matter. *McCarthy v. Olin Corp.,* 119 F.3d 148, 153 (2d Cir. 1997).[1] A plaintiff injured by an allegedly defective product may bring suit against the manufacturer under various theories of recovery. While it is unclear here whether plaintiff is asserting claims of both negligence and strict products liability, the analysis is the same. *See Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 255 (1995). Similarly, in failure to warn cases, New York courts treat negligence and strict liability causes of action as equivalent. *See Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 62 (N.Y. App. Div. 1979), *aff'd* 52 N.Y.2d 768 (1980); *Melendez-Natal v. Maren Eng'g Corp.*, 17 Misc.3d 1126(A) (N.Y. Sup. Ct. 2007).

A product defect may consist of a mistake in manufacturing, an improper design, or inadequacy or absence of warnings for use of the product. *Amatulli v. Delhi Constr. Corp.,* 77 N.Y.2d 525, 532 (1991) (citations omitted). To prevail on a claim of design defect, plaintiff

---

[1] In addition, the parties, by reference to New York law in their papers, agree that the law of that state applies. *See generally Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 61 (2d Cir. 2004).

must show "(1) that the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing plaintiff's injury." *Cuntan v. Hitachi KOKI USA, Ltd.*, 2009 WL 3334364, at *5 (E.D.N.Y. Oct. 15, 2009) (citing *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 109-10 (1983); *Gonzalez v. Delta Int'l Mach. Corp.,* 307 A.D.2d 1020, 1021 (N.Y. App. Div. 2003)). Plaintiff may also prove a product is defective by establishing that it was manufactured improperly. A manufacturing flaw "results from the manufacturer's plans not being carried out correctly, usually caused by an error during the product's manufacture or assembly." *Derienzo v. Trek Bicycle Corp.,* 376 F. Supp. 2d 537, 560 (S.D.N.Y. 2005). To prevail on a claim of manufacturing defect, plaintiff must show that (1) the product is not reasonably safe as marketed, (2) the product was used for a normal purpose, (3) the plaintiff, exercising reasonable care, would not have both discovered the defect and apprehended its danger, and (4) the plaintiff would not have otherwise avoided the injury by the exercise of reasonable care. *See id.* at 560.[2]

Under New York law, a party injured as a result of a defective product may seek recovery from the product manufacturer if the defect was a substantial factor in causing the injury. *See Cushing v. Morning Pride Mfg.,* 2008 WL 283772, at *12 (E.D.N.Y. Jan. 30, 2008); *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 237 (1998). Plaintiff need not prove a specific defect, but may provide circumstantial evidence to support a finding that the product did not perform as intended and that other causes are excluded. *See Speller v. Sears, Roebuck & Co.,* 100 N.Y.2d 38, 41 (2003) (citing *Codling v. Paglia,* 32 N.Y.2d 330, 337 (1973)).

---

[2]The applicable law for a failure to warn cause of action will be discussed *infra*.

The court finds that plaintiff has established, by a preponderance of the evidence, that the fire originated in the bathroom fan. The court finds Mr. Berendsohn's testimony regarding the chain of events – the failure of the metal leading to a locked rotor, overheated motor, and eventually ignition of organic material such as dust or insulation – persuasive. The testimony of Mr. Karn, Detective Pruyn, and Mr. Cristino further supports this finding by establishing that the bathroom fan was the point of origin of the fire. In addition, plaintiff's witnesses have effectively excluded all other potential causes of the fire, and defendant did not offer a credible alternative explanation for the cause of the fire.

The court also finds, based on the testimony of Cristino and Duncan, that the presence of a functional TCO device would have prevented this fire.[3] Plaintiff claims that the bathroom fan was designed, manufactured, and sold without a TCO and thus was not reasonably safe. Defendant argues that the bathroom fan was designed and manufactured properly, that it was modified after it left defendant's control and possession, and that defendant may not be held liable where the accident would not have occurred but for the subsequent modification to the fan.

First, plaintiff suggests that the design specifications for this fan do not reflect the use of a TCO device. Based on the design specifications provided by Jakel Co., as well as the testimony from Duncan regarding those specifications, the court finds that a TCO device was part of the design specification for the Jakel Co. motor, part number J2380626146, incorporated in the

---

[3] Plaintiff's metallurgist witness Berendsohn testified that the metallic composition of the die casting rendered it unsafe for use in high humidity areas such as bathrooms. Plaintiff did not introduce any testimony to suggest that the circumstances that occurred here have occurred elsewhere. Berendsohn also acknowledged that the circumstances of this fire would be difficult if not impossible to duplicate. In light of the finding that a TCO would have prevented the fire, it is unnecessary to determine whether the composition of the die casting constituted a design defect.

Nutone Model 668N fan. Accordingly, since the product was designed with a safety device that would have prevented the fire, the bathroom fan was not defective by reason of improper design.

Plaintiff argues that even if the design specifications required a motor with a TCO, this particular bathroom fan did not come with the safety feature. Nutone claims that the TCO device in this unit was removed by an unidentified third party.

The New York Court of Appeals has held that "a manufacturer of a product may not be cast in damages, either on a strict products liability or negligence cause of action, where, after the product leaves the possession and control of the manufacturer, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries." *Robinson v. Reed-Prentice Div. of Package Machinery Co.,* 49 N.Y.2d 471, 475 (1980). The substantial modification defense is available to shield a manufacturer from responsibility after the product has been substantially altered or modified to disable or destroy a safety feature. *See Pichardo v. C.S. Brown Co.,* 35 A.D.3d 303 (App. Div. 2006) (no manufacturer liability where snowblower was improperly repaired after it left manufacturer's control); *Brodbeck v. Albany Int'l Corp.,* 297 A.D.2d 693 (N.Y. App. Div. 2002) (manufacturer not liable where third party disconnected garage door safety device). Defendant may not be liable if "the accident would not have occurred but for the subsequent modification" of the fan. *Mackney v. Ford Motor Co.,* 251 A.D.2d 298, 299 (N.Y. App. Div. 1998).

Based on the evidence, including examination of the photographs, exemplar, remains of the fan motor after the fire, and the testimony of Duncan, the court finds that a TCO was installed in the fan motor in this case. The wire below the crimp connection in the fan motor is part of the TCO's lead wire. No other satisfactory explanation for this wire has been provided. The court

concludes that the fan was substantially modified to remove the TCO, thereby defeating the safety feature installed by the manufacturer.

The substantial modification defense may not be available where there is evidence that the product was purposefully manufactured to permit its use without the safety feature. *Lopez v. Precision Papers, Inc.,* 67 N.Y.2d 871 (1986). In such cases, however, there is usually evidence that the safety feature was rather easily defeated. *See, e.g., Rios v. Rockwell Int'l Corp.,* 268 A.D.2d 279 (N.Y. App. Div. 2000) (safety guard was designed to be easily removed to facilitate maintenance); *Tuesca v. Rando Mach. Corp.,* 226 A.D.2d 157 (N.Y. App. Div. 1996) (safety feature simply attached by two clips); *O'Bara v. Piekos,* 161 A.D.2d 1118 (N.Y. App. Div. 1990) (chain saw brake attached by two bolts). The fact that the bathroom fan was modified is not, in and of itself, proof that the safety protection provided by the TCO was too easily defeated. *See, e.g., Cacciola v. Selco Balers, Inc.,* 127 F. Supp. 2d 175, 189 (E.D.N.Y. 2001) (noting flawed logic of argument that a) interlock switches should not be too accessible, b) the switch was modified, c) therefore the switch was too accessible). Based on the testimony of Cristino and Duncan regarding the steps that a user would have to take to defeat the TCO, the court finds that the bathroom fan was not purposefully manufactured to permit its use without that safety feature, and thus the *Lopez* exception does not apply.

While evidence supports a finding that the TCO device was, in fact, removed, there is scant evidence regarding the identity of the person or persons who removed it. There is no evidence that the TCO was removed by someone at Jakel Co. or Nutone, nor is there evidence of a logical reason why someone at the manufacturer would do so. The only evidence in the record regarding whether the removal occurred while the fan motor was in the manufacturer's control is

15

Duncan's testimony that a TCO could not be removed on the production line without causing disruption.

Regarding the removal of the TCO after the fan left the manufacturer, plaintiff has provided evidence showing that none of the homeowners modified the fan; it has also provided evidence that none of the homeowners authorized anyone to modify the fan. It has not, however, provided any evidence from the actual electricians or other workers who performed the work on the bathroom, particularly those persons who remodeled the bathroom in the early 1990s during the Mahoney's ownership. Although plaintiff adduced testimony that removing a TCO would not make sense given the low cost of replacing the motor, there was also testimony that workers do unexpected things in the field.

Based on the findings of fact and conclusions of law above, the Nutone bathroom fan in the Curran home was substantially altered post-manufacture to remove a safety device. As the fire would not have occurred in the absence of this modification, Nutone may not be held liable for the resulting damage.

B. Failure to Warn

Even though a defective design claim may be barred by evidence of a substantial modification, plaintiff may still maintain a claim for failure to warn of the consequences of such a modification. *Liriano,* 92 N.Y.2d at 236. To prevail on a failure to warn claim, plaintiff must establish that "(1) the manufacturer had a duty to warn, meaning it knew, or should have known, of latent dangers resulting from intended or reasonably foreseeable unintended uses of the product; (2) the plaintiff used the product in a reasonably foreseeable manner; and (3) the manufacturer's failure to provide a warning was the cause of plaintiff's harm." *Saladino v.*

*Stewart & Stevenson Servs., Inc.,* 2007 WL 4285377, at *9 (E.D.N.Y. Dec. 3, 2007). No warning is necessary if the danger is open and obvious or if plaintiff was a knowledgeable user that knew of the risk. *Liriano,* 92 N.Y.2d at 241-42. The knowledgeable user exception generally does not apply to lay persons, but rather is reserved for professionals. *See Billiar v. Minn. Mining & Mfg. Co.,* 623 F.2d 240, 243-44 (2d Cir. 1980); *Marache v. Akzo Nobel Coatings, Inc.,* 2010 WL 908467, at *9 (S.D.N.Y. Mar. 12, 2010).

Here, the plaintiff has failed to prove its case. The sole evidence of Nutone's duty to warn comes from the testimony of Nutone's Duncan, who stated that he had seen TCO devices in fans bypassed approximately twice in his experience. Assuming arguendo that Duncan's testimony establishes a duty to warn, plaintiff did not provide any evidence of how or where a warning should have been displayed. There is no evidence that a label could have been effectively placed on the TCO or fan itself, and a warning in a manual would have been futile since there is no testimony that anyone consulted the manual before working on the fan. *See Pichardo,* 35 A.D.3d at 304. Moreover, without evidence of who removed the TCO, it is impossible to determine the extent of the knowledge of that user or whether a warning would have been effective. Simply put, plaintiff's evidence is far too speculative to support a finding on this claim. Accordingly, the court finds in favor of defendant on the failure to warn claim.

## IV.  ORDER

For all the foregoing reasons, the court finds in favor of the defendant Nutone.  The clerk of the court shall enter judgment dismissing the complaint.

Dated:  Central Islip, New York                         **SO ORDERED:**
       August  9, 2010

                                                         /s/William D. Wall
                                                         WILLIAM D. WALL
                                                         United States Magistrate Judge